# EXHIBIT 1

CLERK, U.S. DISTRICT COURT
APR - 5 2021
CENTRAL DISTRICT OF CALIFORNIA
BY: RS DEPUTY

KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov
M. LANCE JASPER (Cal. Bar No. 244516)
Email: jasperml@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ZACHARY J. HORWITZ; AND 1INMM CAPITAL, LLC,<br><br>Defendants. | Case No. **2:21-CV-02927-CAS-GJSx**<br><br>**DECLARATION OF JOSEPH DEALTERIS**<br><br>**(FILED UNDER SEAL)** |

**DECLARATION OF JOSEPH DEALTERIS**

I, Joseph deAlteris, declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an individual over 18 years of age and have personal knowledge of the matters set forth herein, except as otherwise noted, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

2. I make this declaration at the request of the staff of the U.S. Securities and Exchange Commission ("SEC").

3. I am a managing member of JJMT Capital, LLC ("JJMT"). The three managing members of JJMT – Jacob Wunderlin, Matthew Schweinzger, and myself (collectively, "JJMT members") – met Zachary Horwitz, the founder and managing member of 1inMM Capital ("1inMM"), while attending Indiana University from 2007-2010, where we became friends.

4. In or about March of 2014, based on my information and belief, Horwitz presented Wunderlin with an investment opportunity in 1inMM, whereby Wunderlin would lend funds in exchange for a promissory note, and the funds would serve to finance and facilitate the licensing of specific media content to a streaming platform. To induce Wunderlin to extend the loan, Horwitz made representations regarding 1inMM, which Wunderlin reasonably believed to be true and accurate, regarding Horwitz's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity. To further induce Wunderlin to extend the loan, Horwitz personally guaranteed Wunderlin's initial loan. In reliance upon Horwitz's representations and his personal guarantee, that same month, Wunderlin and an associate ("EF") loaned approximately $37,000 in exchange for a promissory note with 1inMM. This initial note was timely repaid in full by 1inMM with the specified amount of interest in or about June 2014.

5. From in or about September 2014 through March 2015, Horwitz made additional representations to me, as well as to Wunderlin and Schweinzger, in order to induce us to

lend additional capital to 1inMM in exchange for promissory notes that would finance and facilitate the licensing of specific media content to streaming platforms.  In reliance on these representations, which I reasonably believed to be true and accurate, and the timely repayment with interest by 1inMM of the initial note described above, the following occurred, among other things:

- Wunderlin, Schweinzger, and I agreed to lend additional capital in exchange for promissory notes issued by 1inMM.
- These notes were financed by me, Wunderlin, or Chi Town Capital ("CT Capital"), an entity formed by Wunderlin, Schweinzger, me, and two other associates ("EF" and "TC") for the purpose of providing financing to 1inMM in exchange for promissory notes.  The capital for these notes was provided by Wunderlin, Schweinzger, and me personally, as well as from our friends and associates.
- All of these notes were timely repaid in full by 1inMM with the specified amount of interest.
- The following chart summarizes these loans and the associated media content, as represented by Horwitz and reasonably believed to be true and accurate by me:

| Lender | Title | Transaction Date | Maturity Date | Customer | Loan Amount |
|---|---|---|---|---|---|
| Jacob Wunderlin | Deseo | March 2014 | June 2014 | Sony Pictures | $37,000 |
| Chi Town Capital | Los Olvidados | October 2014 | January 2015 | Sony Pictures | $297,000 |
| Jacob Wunderlin | Fräulein Else | November 2014 | February 2015 | Sony Pictures | $32,500 |
| Jacob Wunderlin | HellFire | December 2014 | June 2015 | HBO Studios | $36,000 |
| Joseph deAlteris | Kickboxer | January 2015 | July 2015 | HBO Studios | $81,100 |
| Chi Town Capital | Wild Night | February 2015 | August 2015 | HBO Studios | $265,000 |
| Chi Town Capital | Anna Waters | February 2015 | August 2015 | HBO Studios | $263,500 |
| Jacob Wunderlin | Skyler | March 2015 | September 2015 | HBO Studios | $38,250 |

6. Among the representations made by Horwitz to induce Wunderlin, Schweinzger, and me to provide financing in exchange for promissory notes to 1inMM as described above,

which I reasonably believed to be true, and which I relied upon in agreeing to provide additional financing in exchange for promissory notes as described below, were the following, among other things:

- Horwitz was well-connected in the content distribution industry as a result of his relationships with Julio Hallivis (his friend), Gustavo Montaudon (Julio's family member), and Javier Salgado (Gustavo's business partner).

- Montaudon was an "industry veteran" with 20+ years' experience in content distribution with direct connections at Netflix/HBO/Sony for the Latin American Markets (https://www.linkedin.com/in/gustavo-montaudon-71989123/; http://www.alebrije.tv/)

- Horwitz had been working for the VC firm Maveron (https://www.maveron.com/), where he had formed relationships with wealthy businessmen Howard Schultz and Dan Levitan.

- Schultz and Levitan were instrumental in creating inroads for Horwitz at platforms such as Netflix, HBO, and Sony and for facilitating the various output deals that 1inMM had in place with these platforms.

- Horwitz had another larger operation called "1inMM Productions" that was financially supported by Schultz and Levitan for the purpose of acquiring titles larger in scale and more speculative in nature.

- In contrast to 1inMM Productions, 1inMM was created specifically to acquire titles that were generally approximately $1 million or less in purchase price.

7. Throughout our dealings with 1inMM and Horwitz, it was critical to my decisions to provide financing to 1inMM that Horwitz made representations and provided documentation, emails, and other information that I reasonably believed to be true and accurate that 1inMM was licensing content to well-established, well-respected, and well-

financed platforms known to be actively seeking and licensing such content in the relevant markets, most notably Netflix and HBO.

8. From in or about April 2015 through October 2015, in reliance upon Horwitz's representations and the documentation, emails, and other information he provided, which I reasonably believed to be true and accurate, and the timely repayment with the specified amount of interest by 1inMM of the prior notes, Wunderlin, Schweinzger, and I were induced to extend thirteen additional loans to 1inMM in exchange for promissory notes via two entities (JTHD Investments and JJMT Group). These were entities created either individually or collectively by Wunderlin, Schweinzger, and/or me (and a fourth associate, "TC") for the purpose of lending additional capital to 1inMM in exchange for promissory notes. The capital for these loans was provided by Wunderlin, Schweinzger, and me personally, as well as by our family, friends, and associates. The following chart summarizes these loans and the associated media content, as represented by Horwitz and which I reasonably believed to be true and accurate:

| Lender | Title | Transaction Date | Maturity Date | Customer | Loan Amount |
|---|---|---|---|---|---|
| JTHd Investments | The Muse | April 2015 | October 2015 | HBO Studios | $225,500 |
| JTHd Investments | The Last Five Years | April 2015 | October 2015 | HBO Studios | $325,250 |
| JTHd Investments | Hell & Back | June 2015 | December 2015 | HBO Studios | $265,000 |
| JTHd Investments | Bronco Belle | June 2015 | December 2015 | HBO Studios | $253,500 |
| JJMT Group | Pound of Flesh | August 2015 | February 2016 | HBO Studios | $235,750 |
| JJMT Group | Stolen Dreams | August 2015 | February 2016 | HBO Studios | $170,500 |
| JJMT Group | Sinister 2 | August 2015 | February 2016 | HBO Studios | $416,000 |
| JJMT Group | Eye in the Sky | September 2015 | March 2016 | HBO Studios | $490,750 |
| JJMT Group | The Adderall Diaries | September 2015 | March 2016 | HBO Studios | $266,750 |
| JJMT Group | Beast | September 2015 | March 2016 | HBO Studios | $195,675 |
| JJMT Group | High-Rise | October 2015 | April 2016 | HBO Studios | $680,650 |
| JJMT Group | Carol | October 2015 | April 2016 | HBO Studios | $375,500 |
| JJMT Group | A Year And Change | October 2015 | April 2016 | HBO Studios | $285,950 |

9. In or about July of 2015, JJMT was created by managing members Wunderlin, Schweinzger, and me (along with "TC," who is no longer affiliated with JJMT). In or about November of 2015, the JJMT members began to utilize JJMT as the primary vehicle to act as a continued source of promissory note financing for 1inMM. The capital deployed by JJMT was provided by the JJMT members personally, as well as by our family, friends, and associates. During this time, Horwitz made representations and provided documentation, emails, and other information to the JJMT members, which I reasonably believed to be true and accurate, and upon which I relied in agreeing to have JJMT provide financing to 1inMM, that indicated as follows, among other things:

- 1inMM and Horwitz would use loan funds from JJMT to acquire distribution rights for the Latin American marketplace from various Foreign Sales Agents ("FSAs").
- Following acquisition from the FSA, 1inMM and Horwitz would sublicense these distribution rights to Sony, HBO or Netflix.
- Repayment of JJMT's loans, inclusive of the specified amount of interest, to 1inMM would be tied to the repayment of licensing fees from Sony, HBO or Netflix to 1inMM.
- Sony's standard payment term/timeline for any transaction was 3 months following the transaction date with 1inMM.
- HBO's standard payment term/timeline for any transaction was 6 months following the transaction date with 1inMM.
- Netflix's standard payment term/timeline for any transaction was 24 months following the transaction date with 1inMM (later, in 2017, this term/timeline became 12 months).
- As such, JJMT's loans to 1inMM would be outstanding for either 3 months (Sony titles), 6 months (HBO titles) or 24 (later 12) months (Netflix titles) depending on which platform ultimately licensed the content.
- Further, in or about March 2017, 1inMM formed a partnership with Pathe International, a content distribution business in Europe. Using loan funds from

JJMT, 1inMM would provide financing to Pathe to acquire the rights to content that Pathe would thereafter sublicense to HBO for the European marketplace. For each of these transactions, Pathe's payment term/timeline was 6 months (consistent with HBO's standard payment term/timeline). Pathe would repay 1inMM, and 1inMM would thereafter repay the JJMT notes, inclusive of the specified amount of interest.

- For Pathe transactions, JJMT would provide approximately 80% of the capital for the loans to 1inMM and Horwitz, via ZJH Enterprise LLC ("ZJH"), would provide JJMT with the additional 20% of loan capital. In turn, ZJH would receive a proportionate share of the interest on these notes upon repayment from 1inMM to JJMT.

- The manner in which 1inMM generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit; and (iv) 1inMM would also, as of in or about March 2017, enter into a profit participation arrangement with Pathe and receive a portion of the gross receipts that HBO paid to Pathe.

10. From the start of the JJMT financing arrangement with 1inMM in or about 2015 until late 2019, JJMT continued to increase the use of the JJMT members' own personal capital, as well as capital from our family, friends, and associates, to provide financing to 1inMM in exchange for promissory notes. In so doing, I relied upon 1inMM's timely repayment of promissory notes in full with the specified amount of interest, as well as upon Horwitz's continued representations and provision of hundreds of documents, emails, and other information that he claimed, and I reasonably believed, to be true and accurate, regarding 1inMM's operations, investments, revenue, transactions, business relationships, and growing

financing opportunities. For example, Horwitz provided JJMT with what was reported to be 1inMM's "Annual Report" from 2015, a true and correct copy of which is attached hereto as Exhibit 1. Additional examples of documents, emails, and other information Horwitz provided to JJMT include, but are not limited to, the following:

- Foreign Sales Agent (FSA) Purchase Agreements
- Licensing and Distribution Agreements with Netflix and HBO
- 1inMM and JJMT Promissory Notes
- Netflix Proposal
- Due Diligence questions and answers
- Communications with FSAs, Netflix, and HBO

Throughout the course of our dealings, in order to induce continued financing from JJMT in exchange for promissory notes, Horwitz provided, among other things, more than 400 documents and contracts, as well as emails, and other materials regarding putative content licensing transactions conducted by 1inMM that Horwitz represented, and I reasonably believed, to be true and accurate. Horwitz would provide these materials and other documents regarding specific content licensing transactions to JJMT via email, secure messenger application, and/or Box. For example, Horwitz and 1inMM provided JJMT with FSA agreements, promissory notes, distribution/licensing agreements, and other relevant deal documents and communication for the following content titles:

- **HBO:** *Blood Quantum*; *Look Away*; *Bitter Harvest*. True and correct copies of putative FSA agreements, promissory notes, and distribution/licensing agreements dated, respectively, July 16, 12, and 30, 2019 (*Blood Quantum*); August 15, 13, and 27, 2019 (*Look Away*); October 02, 2019, September 27, 2019, and October 10, 2019 (*Bitter Harvest*) are attached hereto as Exhibits 2(a)-(c) (*Blood Quantum*); 3(a)-(c) (*Look Away*); 4(a)-(c) (*Bitter Harvest*).

- **Netflix**: *Active Measures*; *Divide & Conquer*; *Lucia's Grace*. True and correct copies of putative FSA agreements, promissory notes, and distribution/licensing agreements dated, respectively, December 17, 17, and 21, 2018 (*Active Measures*);

December 17, 17, and 21, 2018 (*Divide & Conquer*); February 27 and 27, 2019, and March 4, 2019 (*Lucia's Grace*) are attached hereto as Exhibits 5(a)-(c) (*Active Measures*); 6(a)-(c) (*Divide & Conquer*); 7(a)-(c) (*Lucia's Grace*).

11. As noted above, JJMT's continued participation in its financing arrangement with 1inMM was induced in part by 1inMM's full and timely repayment with the specified amount of interest of promissory notes. From the start of the JJMT financing arrangement described above until in or about late 2019, 1inMM did not default on any loans made by JJMT.

12. From in or about mid 2015 until late 2019, JJMT's financing of 1inMM's content licensing transactions continued to grow. During this time, JJMT provided financing to 1inMM in exchange for promissory notes with total principal value of approximately $485 million. The amount repaid by 1inMM to JJMT during this period for these promissory notes, inclusive of specified interest, was approximately $440 million, some of which was redeployed by noteholders for future loans. At present, JJMT currently has delinquent and unpaid notes owing from 1inMM with principal values of approximately $165MM (exclusive of interest) for amounts loaned in or about 2018 and 2019. Collectively, the JJMT members represent JJMT's largest noteholders with approximately $42.5 million in principal value of notes outstanding, which is approximately 26% of the outstanding note principal owed to JJMT by 1inMM.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __29th__ day of March, 2021 in _____Chicago_____, _____Illinois_____.

_____
Joseph deAlteris

8