## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

STEVEN ARONSON, MATTHEW ARONSON,

        Plaintiffs,

v.

JJMT CAPITAL LLC, a Delaware limited liability company, JACOB WUNDERLIN, MATTHEW SCHWEINZGER, JOSEPH DEALTERIS, TYLER CROOKSTON,

        Defendants.

Case No. 21-CV-01867

Hon. Franklin U. Valderrama

## RESPONSE TO MOTION TO DISMISS

Plaintiffs, Steven Aronson and Matthew Aronson (collectively the "Aronsons"), by and through their attorneys Howard & Howard Attorneys PLLC, respond to the Motion to Dismiss (Dkt. No. 29) filed by Defendants JJMT Capital, LLC, Matthew Schweinzger, Joseph deAlteris and Jacob Wunderlin ("Defendants").

## INTRODUCTION

Matthew Schweinzger, Joseph deAlteris, Jacob Wunderlin, and Tyler Crookston (collectively the "Individual Defendants") are owners and managing partners of JJMT Capital, LLC ("JJMT"), an entity that the Aronsons allege the Individual Defendants designed for one purpose—to funnel money from outside investors to an individual named Zachary Horwitz ("Horwitz") and his entities, 1inMM Capital, LLC and 1inMM Productions (collectively the "1inMM Entities"). As alleged in the Complaint, JJMT and the Individual Defendants made money by arbitraging these funds for profit and ensuring a return on Defendants' investments. For the Individual Defendants, it was the perfect setup; except for one issue: Horwitz and the 1inMM

4845-3348-6842, v. 1

Entities were running a massive Ponzi scheme[1], and Defendants either knew about that scheme or acted so recklessly that they failed to discover it. In the process of obtaining funds from the Aronsons, the Defendants made their own false representations and now assert a variety of theories as to why the Plaintiffs have failed to state a cause of action. These theories are without merit.

## I. STANDARD

To survive Defendants' Motion to Dismiss, the Aronsons' complaint must only contain sufficient "factual allegations, accepted as true, sufficient 'to state a claim to relief that is plausible on its face.'" *Mack v. Chi. Transit Auth*., No. 17-CV-06908, 2020 WL 6545039, at *1 (N.D. Ill. Nov. 6, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). A plaintiff need only to plead facts that "nudge [a] claim across the line from conceivable to plausible.'" *DiMaio v. Wexford Health Sources, Inc.,* No. 19-CV-06613, 2021 WL 1056848, at *4 (N.D. Ill. Mar. 19, 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Eight of the Aronsons' claims allege fraud or sound in fraud (Counts I, II, III, IV, V, VI, IX, and X) and therefore those claims are subject to Rule 9(b)'s pleading requirements. However, even under the Rule 9(b) pleading regime, what must be plead by a plaintiff depends on the facts of a given case. *Emery v. Am. Gen. Fin., Inc*., 134 F.3d 1321, 1324 (7th Cir.1998). Generally, plaintiffs like the Aronsons must allege "the who, what, when, where, and how" of the fraud. *Borsellino v. Goldman Sachs Grp., Inc*., 477 F.3d 502, 507 (7th Cir. 2007). Importantly, "plausibility remains the pleading benchmark, even when a claim is subject to Rule 9(b)'s particularity requirement." *Hobbs v. Gerber Prods. Co.*, No. 17 CV 3534, 2018 WL 3861571, at

---

[1]Horwitz and the United States reached a plea agreement that was filed on September 1, 2021, whereby Horwitz admitted that he ran a $650 million Ponzi Scheme. Case No. 2:21-cr-00214-MCS, United States District Court, Central District of California. Dkt. No. 45. A copy of that plea agreement is attached hereto as "Exhibit 1".

4845-3348-6842, v. 1

*8 (N.D. Ill. Aug. 14, 2018) (noting that "the Seventh Circuit has 'warned that courts and litigants often erroneously take an overly rigid view of the formulation.'"). Finally, Rule 9(b)'s specificity requirements should be relaxed when the details are within the defendants' exclusive knowledge. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994).

## II. FACTS

When ruling on a Motion to Dismiss, this Court should accept all well-pleaded facts as true and draw all reasonable inferences in favor of the Plaintiffs. *Kubiak v. City of Chi.*, 810 F.3d 476, 480–81 (7th Cir. 2016). Therefore, the following facts must be taken as true. At all relevant times, Defendant Matthew Schweinzger ("Schweinzger") was Chief Acquisition Officer of Acrisure, LLC ("Acrisure"). (Plaintiffs' First Amended Complaint ("FAC"), ¶ 11). Prior to working at Acrisure, Schweinzger was an experienced investment banker at Morgan Stanley. (FAC, ¶¶ 13, 14). Schweinzger exercised supervisory control over Steven Aronson when he sent him an e-mail using his Acrisure e-mail account about an "investment opportunity." (FAC, ¶¶ 15, 26, Ex. 2). The investment opportunity that Schweinzger referred to was to be an investment with JJMT, a company he formed along with Jospeh deAlteris ("deAlteris"), Jacob Wunderlin ("Wunderlin"), and Tyler Crookston in 2015. (FAC, ¶¶ 4, 21). JJMT was formed for the purpose of loaning solicited investment funds to Horwitz, a college friend of theirs, and the entities he controlled, the 1inMM Entities. (FAC, ¶¶ 17, 21).

JJMT solicited these funds under the guise that the funds were to be used to finance the creation of media, such as films, that would then be licensed to media platforms, such as Netflix and HBO. (FAC, ¶ 17). In reality, Horwitz was running a Ponzi scheme, using the funds to support a lavish lifestyle. (FAC, ¶ 18). Prior to soliciting the Aronsons' investments, Schweinzger, deAlteris, and Wunderlin did not attempt to independently verify any of the representations made

4845-3348-6842, v. 1

by Horwitz or confirm the authenticity of any documents he provided to them and JJMT. (FAC, ¶¶ 19, 20). At the time JJMT became the primary vehicle the Individual Defendants employed to acquire more capital from the Aronsons to invest into the 1inMM Entities, the Individual Defendants had already provided over $4,186,000 in loans to the 1inMM Entities. (FAC, ¶ 24).

On October 9, 2016, Schweinzger sent Steven Aronson a second E-mail (the "October 9 E-mail") explaining the "investment opportunity" with JJMT. (FAC, ¶ 28, Exhibit 3). In the October 9 E-mail, Schweinzger repeatedly stated that JJMT was the entity negotiating both the purchase of media rights and their subsequent sale to entities like HBO and Netflix. (FAC, ¶¶ 31–35). Importantly, Schweinzger stated that the difference between the purchase price and sale price of those media rights is "what we use to pay the investors in JJMT." (FAC, ¶ 31, Ex. 3). Schweinzger stated that capital calls from its investors does not occur until "_we_ have a deal completely negotiated, signed up and ready." (FAC, ¶ 35, Ex. 3) (emphasis supplied). Schweinzger further stated that investments with JJMT were "a very low risk debt...vehicle" and an "excellent outlet for excess cash that's otherwise in a checking account or low interest bearing money market fund." (FAC, ¶¶ 30, 34, Ex. 3). These factual representations were false. (FAC, ¶ 30–35, Ex. 3).

Attached to the October 9 E-mail was an "Investor Opportunity Overview" (the "Overview"). (FAC, ¶ 36, Ex. 4). Prior to transmitting the October 9 E-mail and Overview, JJMT and the Individual Defendants failed to independently verify any statements made by Horwitz and the 1inMM Entities regarding the alleged transactions between the 1nMM Entities and media companies, such as Netflix and HBO. (FAC, ¶ 48, 49). Rather, they apparently simply relied on Horwitz's alleged statements and documents provided by Horwitz. (FAC, ¶ 19). Defendants now admit that there "were no relationships with HBO or Netflix." (Defendants' Joint Motion to Dismiss, p. 1). The Overview falsely stated that JJMT had itself financed multiple films and

provided details on these previous media purchases. (FAC, ¶ 39).

By March 11, 2021, the Aronsons had collectively invested $1,837,000.00 into JJMT via the purchase of promissory notes that have today not been satisfied. (FAC, ¶¶ 56-57, 60). The Aronsons believed what JJMT and the Individual Defendants misrepresented to them in the October 9 E-Mail, the Overview and the promissory notes themselves that the money they loaned to JJMT was being used to finance and acquire media projects (FAC, ¶ 58). Promissory notes issued by JJMT identified the purpose of the funds being given by the Aronsons—for example, JJMT stated the proceeds of the "Storm-Steven Aronson Note" would be used for "financing the acquisition of distribution rights" of "Run the Race" and "Storm Boy." (FAC, Ex. 17).

Schweinzger continued to repeat the false assertions made in the October 9 E-mail and Overview to the Aronsons throughout 2016 to 2020 via e-mails, phone calls, and in-person meetings. (FAC, ¶ 61). He repeatedly falsely asserted that JJMT was landing deals with HBO and Netflix. (FAC, ¶ 61). On December 14, 2017, Schweinzger falsely stated in an e-mail that, "we've landed another HBO deal." (FAC, ¶ 61). On June 13, 2018, he falsely asserted that "[w]e just landed another Netflix package" (FAC, ¶ 61). Based on the false representations contained in the October 9 E-mail, Overview, and subsequent communications, the Aronsons believed that JJMT itself was involved with the negotiation and sale of content to media platforms, when in fact they were not. (FAC, ¶¶ 61-62).

Furthermore, Defendants repeatedly assured the Aronsons that they were conducting due diligence on the transactions. (FAC, ¶ 63). Defendants made false representations to the Aronsons to assuage any concerns regarding repayment of securities JJMT had sold them. (FAC, ¶ 63). For example, on November 16, 2020, Schweinzger stated: "1inMM successfully remedied all open items with Netflix relating to their audit requests, on October 29th, Netflix informed 1inMM that

the audit had formally concluded." (FAC, ¶ 63). Defendants made similar false statements to the Aronsons in an effort to induce the Aronsons to refrain from filing litigation against them. (FAC, ¶ 63).

## I.     **ARGUMENT**

### A. **DeAlteris, Wunderlin, and Schweinzger May Be Held Individually Liable for the False Statements in the Overview.**

Even though deAlteris and Wunderlin never spoke directly with the Aronsons on an individual basis, they can be held liable for violations of the Illinois Securities Law ("ISL"), the Illinois Consumer Fraud Act ("ICFA") and conspiracy to defraud due to their involvement in JJMT.

The Aronsons can satisfy Rule 9(b)'s specificity requirements "through reliance upon a presumption that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors.'" *Petri v. Gatlin*, 997 F. Supp. 956, 974 (N.D. Ill. 1997) (quoting *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995)); *Morse v. Abbott Labs.*, 756 F. Supp. 1108, 1111 (N.D. Ill. 1991) ("[W]here the false or misleading information is conveyed in . . . 'group-published information,' it is reasonable to assume that these are the collective actions of the officers."). In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, the Seventh Circuit Court of Appeals noted that there is a "group pleading presumption" which is "premised on the assumption that in cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other `group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir.2006).

Here, the Overview, October 9 E-mail and subsequent statements, such as investor updates in 2016 through 2020, can be reasonably interpreted as "group published information" and the group pleading presumption should therefore apply. The Overview is on JJMT letterhead and

contains multiple references to both Wunderlin and deAlteris. (FAC, Ex. 4). Most tellingly, the Overview identifies Wunderlin and deAlteris as Managing Partners and invites potential investors to reach out to "any" of the Managing Partners for more information. (FAC, Ex. 4, p. 15). A reasonable inference from the inclusion of their names in the Overview is that Wunderlin and deAlteris reviewed the Overview and gave approval for their names to be included in the Overview. After all, all of the Individual Defendants benefitted from the funds being solicited by Schweinzger. Likewise, in his October 9 E-mail, Schweinzger mentions that the Managing Partners of JJMT, "we (the Managing Partners) pencil you in for up to the total amount you've committed." (FAC, Ex. 3, p. 2). Each promissory note drafted by and issued by JJMT contained specific statements that the money would be used to fund specific media purchases. (Ex. 5-19).

Therefore, it is clear that all of the Individual Defendants can be held accountable for the false statements relied upon by the Aronsons. Defendants' reliance on *Jackson v. South Holland Dodge, Inc.*, 197 Ill.2d 39, 41 (Ill. 2001) for the proposition that they can avoid individual liability under the ICFA is misguided. In *Jackson*, the plaintiff sought to include a car manufacturer in a consumer fraud claim on the basis that the car manufacturer provided a blank form that was later filled in by third parties not employed or controlled by that car manufacturer. *Id*. at 52–53. Unlike the blank forms at issue in *Jackson*, the Aronsons allege—and are entitled to a presumption— that the Individual Defendants are themselves directly responsible for the creation and dissemination of the misrepresentations in the various communications made by Schweinzger and JJMT issued documents, such as the Notes and Overview.

**B. The Aronsons Alleged Facts in the First Amended Complaint that Demonstrate that Wunderlin and deAlteris were "Controlling Persons" of JJMT under the ISL.**

There can be no dispute from Defendants that Wunderlin and deAlteris were "managing members" of JJMT at all relevant times. Under Delaware law, a member in a member-managed

limited liability company (an "LLC") has the power to manage the LLC in proportion to its ownership share. 6 Del. C. § 18–402. The Seventh Circuit Court of Appeals has held that, "[b]y default, under Delaware law, authority is vested in the members of an LLC." *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 510 (7th Cir. 2011). In *Longview*, a member of a Delaware LLC asserted that he should not be considered an "insider" of the LLC because he had essentially been frozen out of control of that LLC. *Id.* at 510–511. The Seventh Circuit rejected that claim, holding that his member status "caused him to retain meaningful rights and control given to members" and that a member in a member-managed LLC would be akin to a director of a corporation. *Id.* at 511.

Under the Illinois Securities Law, a "controlling person" means any person offering or selling a security, or group of persons acting in concert in the offer or sale of a security, who directly or indirectly controls the activities of the issuer. 815 ILCS 5/2.4. As a Court in this District has recently held, "a controlling person need not always take overt action, but 'there must be some showing of assent, approval or concurrence, albeit tacit approval, in the action of the group selling securities, before an individual will be held liable for the action of the controlling group.'" *Diamond v. Nicholls*, 483 F. Supp. 3d 577, 591 (N.D. Ill. 2020) (quoting *Elipas v. Jedynak*, No. 7 C 3026, 2010 WL 1286795, at *5 (N.D. Ill. Mar. 26, 2010)). The Court noted that "[s]ome connection with the sale, or decision to sell, securities is required under the statute." *Diamond*, 483 F. Supp. 3d at 591 (quoting *Elipas*, 2010 WL 1286795, at *5).

Even at this embryonic stage of this litigation, it is clear that Wunderlin and deAlteris were involved in the decision to sell the Aronsons' securities and gave approval, assent or at least "tacit approval" to the sale of the securities in question. Wunderlin and deAlteris's names are contained in the Overview and the October 9 E-mail. As managing-members of JJMT, there is a reasonable inference that Wunderlin and deAlteris authorized the securities like the Aronsons bought.

Minimally, Plaintiffs are entitled to this presumption at the Motion to Dismiss stage.

Beyond the direct references to Wunderlin and deAlteris in the various offering materials provided to the Aronsons, the Aronsons allege that Wunderlin and deAlteris were motivated to obtain new investments for Horwitz and his entities; namely that the funds funneled through Horwitz's entities would be used to pay them back for their own investments in Horwitz's alleged Ponzi scheme (FAC, ¶¶ 25, 50). In *Froehlich v. Matz*, a defrauded investor solicited new investments in a sham corporation that was partly controlled by him to lessen his own losses and the Illinois Appellate Court found that he was a "controlling person" for purposes of the ISL. *Froehlich v. Matz*, 417 N.E.2d 183, 194 (Ill. App. Ct. 1981). Likewise, the Aronsons allege that Wunderlin and deAlteris' solicitation of the Aronsons lessened their exposure to Horwitz's Ponzi scheme. (FAC, ¶¶ 25, 50).

## C. Defendants' Alleged "Anti-Reliance" Argument Does Not Bar Plaintiffs' Claims, as a Matter of Law.

The existence of an alleged "anti-reliance clause" in the Overview does not provide a defense that defeats the Aronsons' claims as a matter of law, and the Aronsons have asserted that the misrepresentations were made contemporaneously, not prior, to the delivery of the Overview.

### 1. Defendants' Purported Anti-Reliance Clause Cannot Form the Basis for Dismissal Under Rule 12(b)(6).

The reasonableness of the Aronsons' reliance on Defendants' misrepresentations is an issue in Counts I, II, V, VI, VII, and VIII. As a matter of law, reliance is generally a question of fact. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). The reasonableness of reliance can only be decided as a matter of law "when only one conclusion can be drawn" *Id*. Defendants have failed to present a reason why only one conclusion can be drawn from the facts alleged by the Aronsons.

Importantly, the Seventh Circuit Court of Appeals' decision in *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000), does <u>not</u> hold that the existence of a non-reliance clause precludes a finding of reasonable reliance on a prior representation, as a matter of law. *Rissman*, 213 F.3d at 388–89 (Rovern, J., concurring); *see also Petrakopoulou v. DHR Int'l, Inc.*, 590 F. Supp. 2d 1013, 1018 (N.D. Ill. 2008). Rather, a determination of reasonable reliance depends on an analysis of all relevant factors. *Trapelli v. Advanced Equities, Inc.*, 215 F. Supp. 2d 964, 970-971 (N.D. Ill. 2002).

Importantly, *Rissman* and *Horlbeck*, the two main cases Defendants cite were both decided at the summary judgment stage, not the motion to dismiss stage. *Rissman*, 213 F.3d at 383; *In re Horlbeck*, 589 B.R. 818, 825 (Bankr. N.D. Ill. 2018). Indeed, courts across this country have held that an anti-reliance clause should not be enforced via a motion to dismiss. *See Supernova Sys., Inc., v. Great Am. Broadband, Inc.*, No. 1:10-CV-319, 2012 WL 860408, at *5 (N.D. Ind. Mar. 12, 2012) (collecting cases holding that *Rissman* should not apply in a motion to dismiss).

While Defendants cite *Rissman* and *Horlbeck* for general propositions they fail to explain why the anti-reliance clause and integration clause in the Overview, taken in a vacuum, bar the Aronsons' claims as a matter of law when contemporaneous written statements were delivered to the Aronsons via the October 9 E-mail. In *Rissman*, the plaintiff alleged he relied on prior oral representations. *Rissman*, 213 F.3d at 383. In this case, the Aronsons allege that they relied on the Defendants' <u>contemporaneous written misrepresentations</u> which were intended to and did overshadow the Overview in some respects. Because the October 9 E-Mail was delivered contemporaneously, *Rissman* is distinguishable and provides no support to Defendants' conclusion that the Aronsons' reliance on the misrepresentations in the October 9 E-mail was unreasonable as a matter of law.

Second, the oral nature of the misrepresentations in *Rissman* was a significant factor in the

4845-3348-6842, v. 1

Seventh Circuit's reasoning affirming the validity of the anti-reliance clause because those oral statements are subject to the vagaries of memory and fabrication. *Id.* at 384. Here, there is no danger that the Plaintiffs are misremembering Defendants' deceptive and fraudulent statements—those statements are in writing and were transmitted at the same time the Overview was given and at later dates. Therefore, Defendants' reliance on *Rissman* is misplaced.

### D. The Anti-Reliance Clause Does Not Protect Defendants from the Misrepresentations in the October 9 E-mail Since It Constitutes a Part of the Offering Materials.

Defendants' reliance on their own "anti-reliance" clause is misguided because the anti-reliance clause in the Subscription Agreement defines the October 9 E-mail as part of the Offering Materials.

The Subscription Agreement, drafted by Defendants, defines "Offering Materials" as "collectively, the 'Investor Opportunity Overview' **as previously provided** to the Investor, and this Agreement, including the form Note attached as an appendix to this Agreement." (FAC, Ex. 3, Subscription Agreement, p. 1) (emphasis added). The Subscription Agreement goes on to say that the Plaintiffs are "entering into this Agreement relying solely on the information set forth in this Agreement and the other Offering Materials." (FAC, Ex. 3, Subscription Agreement, p. 4).

Plaintiffs allege that the October 9 E-mail constitutes a part of the "Offering Materials" because it was precisely an aspect of the "previously provided" Investor Opportunity Overview (FAC, ¶ 40). Specifically, the October 9 E-mail provided the Overview to Plaintiffs, and is therefore an integral part of the "Offering Materials." Any ambiguity in a contract is resolved against the drafter of the document. *Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020). Defendants drafted the Subscription Agreement and they included the "as previously provided" language, and therefore the October 9 E-mail can fairly be construed as a component of the Offering Materials.

Finally, Defendants must have intended that the Aronsons rely on the information in the October 9 E-mail since it was the only place that provided certain details regarding JJMT's investment process. *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1001 (7th Cir. 2018). In *Newman*, the Seventh Circuit held that a party was justified in relying on a brochure that was not part of an insurance policy because that brochure was the only place where directions regarding a plan was provided. *Id.* Here, the October 9 E-mail contains an in-depth breakdown on when capital calls are made; that information is not included in the Overview. Finally, the notes sold by Defendants contain their own misrepresentations embedded in them; the money was not used by JJMT to finance specific movie rights, they were sold so that JJMT and the Individual Defendants could lend that money to the 1inMM Entities and receive a higher rate of return. Defendants' anti-reliance clause does not permit them to have this case dismissed as a matter of law.

### E. Defendants' Attempted Disclaimer Does Not Negate the Materiality Prong of Plaintiffs' Claims Under the ISL or Common Law Fraud.

Defendants purported disclaimer does not bar the Aronsons' claims because Defendants failed to provide the Aronsons with any "meaningful cautionary language" that could bar their claims as a matter of law. Specifically, at the same time that the Overview provided cautionary statements about a possible inability of JJMT to pay back investments, Schweinzger was affirmatively stating to the Aronsons that securities issued by JJMT were a "very low risk debt investment vehicle" and that it was an "excellent outlet for excess cash that's otherwise in a checking account or low interest bearing money market fund." (FAC, ¶¶ 30, 34). The October 9 E-mail also states that JJMT, not the 1inMM Entities, were the ones buying and selling media rights. (FAC, ¶¶ 30-35, Ex. 3). Indeed, in the October 9 E-mail, Schweinzger stated that capital calls are not made until "[o]nce we have a deal completely negotiated, signed up and ready." (FAC, ¶ 35, Ex. 3).

4845-3348-6842, v. 1

It is absurd for Defendants to claim these statements—provided at exactly the same time and in the same communication as the Overview—collectively provide any type of "meaningful cautionary language" to the Aronsons. In fact, these statements are the very opposite of "cautionary" language, as Defendants affirmatively stated that investments with JJMT were "very low risk" and equated them with zero risk vehicles, such as checking accounts, and state that capital calls are not made until JJMT has deals signed up and negotiated. The October 9 E-mail also falsely stated that JJMT was purchasing the film rights and selling them directly to media producers.

To the extent that the Overview contained some cautionary language, it is completely negated or downplayed by the statements contained in the October 9 E-mail. Indeed, Defendants' proffered case—*Lagen v. Balcor Co.*, 653 N.E.2d 968 (Ill. App. Ct. 1995) demonstrates that absurdity. In *Lagen*, potential investors were sent private placement memorandums ("PPMs") that were 100 pages long and contained "detailed information" concerning the potential investments and tax and legal aspects of the investment. *Id.* at 971. The plaintiffs in *Lagen* then sued the company that issued the PPMs after federal law was changed that made their investments heavily taxed. The Second District held that the extensive cautionary language in the PPMs did not "downplay or ignore" the possibility of changes in federal taxation law. *Id.* at 974. As stated above, the Defendants took the opposite tact in the October 9 E-mail to the Aronsons—they heavily downplayed the risk and made inaccurate factual disclosures.

Finally, the "bespeaks doctrine" bars Defendants from asserting that the cautionary statements protect them, since Defendants possessed materially adverse information about their supposed deals with media companies and did not disclose them to the Aronsons. *Rasgaitis v. Waterstone Fin. Grp., Inc.*, 985 N.E.2d 621, 632 (Ill. App. Ct. 2013). Because the October 9 E-mail and subsequent communications are replete with lies and false statements, the "bespeaks

doctrine" prevents Defendants from asserting that their other cautionary statements somehow shield them from liability.

**F. The Aronsons Have Properly Plead a Consumer Fraud Act Claim.**

The Aronsons have properly plead a cause of action under the ICFA. As discussed above, the Aronsons have plead multiple deceptive acts, including false statements regarding JJMT's role in procuring deals with media creators/distributors and false statements about JJMT conducting due diligence on those deals. The crux of the Aronsons' complaint is not that 1inMM defrauded JJMT, but rather JJMT defrauded the Aronsons by*, inter alia*, making false and deceptive statements about JJMT's role.

The Aronsons have sufficiently alleged that Defendants intended that they rely upon their deceptive conduct. A plaintiff need not prove that a defendant intended to deceive him or her, only that the defendant intended that the plaintiff rely upon the deceptive conduct at issue. *Capiccioni v. Brennan Naperville, Inc*., 791 N.E.2d 553, 558 (Ill. App. Ct. 2003). Defendants argue that they could not have deceived the Aronsons since Defendants did not know they were funding Horwitz's Ponzi scheme. However, regardless of whether they knew about the Ponzi scheme (an open question at this point), the Individual Defendants nonetheless made deceptive statements about JJMT itself, the investments JJMT was offering, and JJMT's level of due diligence regarding the investments.

Finally, the Aronsons sufficiently alleged that they were in fact deceived and damaged by the deception, as they invested millions of dollars with JJMT based on the Individual Defendants' deceptive statements. Importantly, plaintiffs like the Aronsons only need to make "minimal" allegations "since that determination is best left to the trier of fact." *Connick v. Suzuki Motor Co., Ltd*., 675 N.E.2d 584, 504 (Ill. 1996). For a plaintiff to establish proximate causation, the plaintiff

must show "that he or she was, 'in some manner, deceived' by the misrepresentation." *Avery v. State Farm Mut. Auto. Ins. Co*., 835 N.E.2d 801, 200 (Ill. 2005). The Aronsons have alleged that they invested millions of dollars with JJMT based on the multitude of deceptive statements made in the October 9 E-mail, the Overview, and subsequent statements, and that the Aronsons were financially damaged as a result. The Aronsons have therefore properly plead proximate cause under the ICFA.

Defendants' alleged lack of knowledge regarding Horwitz's Ponzi scheme is immaterial to the Aronsons' fraud claims because the Individual Defendants misrepresented the role of JJMT itself and its use of the Aronsons' money.

The Aronsons have plead that Defendants made numerous false statements of material fact in the October 9 E-Mail, the Overview, and in subsequent updates to investors about JJMT itself. Defendants knew these statements were false since JJMT never actually negotiated any deals with any media creators or distributors and never confirmed any fact about any of these investments with the entities themselves. Beyond making knowingly false representations about JJMT, the Aronsons plead that the Defendants made statements about the 1inMM Entities "with a reckless disregard for their truth or falsity." *Newman*, 885 F.3d at 1003. The Aronsons alleged that Defendants "due diligence" regarding 1inMM Entities was limited to Defendants asking Horwitz to confirm the truthfulness of his own statements and blindly relying on documents that Horwitz provided. In fact, the Declarations attached to the Aronsons' Complaint and Defendants' Response, confirm a virtual lack of actual due diligence. Defendants essentially admit that they were totally reckless in investing JJMT's money; they simply relied upon Horwitz's verbal statements and documents that Horwitz himself provided. (FAC, Ex. 1, ¶ 10). While they were blindly accepting Horwitz's statements as true, JJMT distributed the Overview and other

documents to the Aronsons which stated the 1inMM Entities' projects did in fact exist. Later communications stated that the 1inMM Entities had actually fixed the 1inMM Entities' issues with Netflix. (FAC, ¶ 63). Defendants did not care whether the 1inMM Entities actually invested the money in film projects because they were making money from the Aronsons by taking their money, promising a rate of return, and then being promised a higher rate of return from the 1inMM Entities. (FAC. ¶ 50). This is a reasonable conclusion since Defendants had money invested in the 1inMM Entities prior to taking the Aronsons' money.

Finally, Defendants suggest that the Aronsons' reliance on their untrue statements was not justified because the Aronsons could have done their own due diligence. However, under Illinois law, "one is justified in relying upon the representations of another, without independent investigation, where the person to whom the representations are made does not have the same ability to discover the truth as the person making the representations." *Gerill Corp. v. Jack L. Hargrove Builders, Inc*., 538 N.E.2d 530, 537 (Ill. 1989). This case presents a textbook set of facts demonstrating that Defendants were in the best (and probably the only) position to discover the truth or falsity of Horwitz's scheme.

The Aronsons were justified in relying on Schweinzger's October 9 E-mail and the statements in the Overview and subsequent statements because Defendants, not the Aronsons, had the relationship with Horwitz. It is difficult to imagine what kind of investigation or process Defendants can expect the Aronsons to engage in. Finally, the Overview directed the Aronsons to contact the general partners of JJMT, not Horwitz, for more information; it did not provide the Aronsons with any way of getting in contact with Horwitz or HBO, Netflix or Sony. Defendants, not the Aronsons, were the ones selling a product, and representing the investments' integrity.

## G. Plaintiffs Have Plead Facts That Support Their Fraudulent Misrepresentation Claim.

4845-3348-6842, v. 1

Beyond their reliance on their vague and unenforceable anti-reliance clause, Defendants' only argument related to the Aronsons' fraudulent misrepresentation claims is that Schweinzger did not know about Horwitz's Ponzi scheme. As discussed above in Sections II.E, and II.F, the Aronsons allege that Schweinzger made false statements about JJMT's role in the movie funding business, and Schweinzger knew those statements were false. Moving beyond the obviously false statements about JJMT itself, the Aronsons allege that Schweinzger recklessly disregarded the truth about Horwitz's Ponzi scheme by refusing to take even rudimentary due diligence steps like speaking to either the movie content creators or distributors to confirm the existence of the movie deals.

### H. The Moorman Doctrine Does Not Bar Plaintiffs' Negligent Misrepresentation Claim Because Defendants Were in the Business of Providing Information.

The Aronsons have adequately plead that Defendants had a duty to convey accurate information and the "Moorman Doctrine" does not bar the Aronsons' negligent misrepresentation claim.

As Defendants note, there is an exception under the Moorman Doctrine for individuals who are information suppliers. *Tolan & Son, Inc. v. KLLM Architects, Inc*., 719 N.E.2d 288, 291 (Il. App. 1999). Importantly, the "supplying of information need not encompass the enterprise's entire undertaking but must be central to the business transaction between the parties." *Id.* at 297. Here, Defendants placed themselves into a position where they were information providers. In the October 9 E-mail, Schweinzger states that one of the key services that JJMT provides to investors is providing "all the deal specifics and make sure you're still good" (FAC, Ex. 3). Therefore, a key component of what Defendants claimed to provide to the Aronsons was information. *See Premier Cap. Mgmt., LLC v. Cohen*, No. 02 C 5368, 2008 WL 4378300, at *26 (N.D. Ill. Mar. 24, 2008) (noting there is an "obvious legal ambiguity" over stock, which is an "obvious example of

something in between the two extremes: stock is a product that can be sold, yet information on the value of the stock is a key component"). Similarly, in *Zurad v. Lehman Bros. Kuhn Loeb*, 757 F.2d 129 (7th Cir. 1985), the Seventh Circuit Court of Appeals determined that the defendant brokerage firm could be held liable as an information provider. 870 F.2d at 133–34. Likewise, in *Rankow v. First Chi. Corp.*, 870 F.2d 356, 366 (7th Cir. 1989), the Seventh Circuit held that a bank which sold stock to the plaintiffs had a duty to provide accurate information in a prospectus.

Here, the Defendants assumed the role of an information provider because information related to the acquisition of media projects was central to the transaction between the Aronsons and JJMT. Defendants asserted in the October 9 E-mail that they would not contact the Aronsons for capital until "*we* have a deal completely negotiated, signed up and ready." (FAC, Ex. 3) (emphasis added). Therefore, Defendants assumed a duty to convey accurate information.

## I. Plaintiffs Have Adequately Plead a Conspiracy.

The Aronsons have properly plead a civil conspiracy claim. The elements of civil conspiracy include: "(1) a combination of two or more persons; (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means; (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Linkepic Inc. v. Vyasil, LLC*, 370 F.Supp.3d 906, 925 (N.D. Ill. 2019).

Furthermore, "[c]onspiracies are often intentionally 'shrouded in mystery,' which by nature makes it difficult for the plaintiff to allege with complete specificity all of the details of the conspiracy." *Ill. Non-Profit Risk Mgmt. Ass'n v. Hum. Serv. Ctr. Of S. Metro-E*., 884 N.E.2d 700, 711 (Ill. App. Ct. 2008). As a result, conspiracy is typically established "from circumstantial evidence and inferences drawn from evidence, coupled with commonsense knowledge of the behavior of persons in similar circumstances." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894

(Ill. 1994). Therefore, a plaintiff "cannot be required to plead with specificity the very facts that can only be proven by circumstantial evidence." *Id.* at 895; *see also Patrick v. City of Chi.*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016). The Aronsons plead that the Defendants conspired with each other to defraud the Aronsons (and other investors) out of money by making false statements about JJMT and its role in obtaining media rights and selling them for profit and that the Defendants willfully ignored the validity of the 1inMM Entities' business dealings because the Defendants were enriching themselves at the expense of Plaintiffs and other investors. (FAC, ¶ 50).

**J. Plaintiffs Can Plead Notice Under the ISL.**

Finally, Defendants argue that the Aronsons must allege they sent the notice required by Section 13 of the Illinois Securities Law. 815 ILCS 5/13(B). Importantly, Defendants do not allege that notice was not sent, because it was served upon Defendants' counsel as well as the current members of JJMT. Plaintiffs can allege reliance and will do so, if the Court requires it. *Wislow v. Wong*, 713 F. Supp. 1103, 1107 (N.D. Ill. 1989) (giving a plaintiff an opportunity to make the notice allegation since counsel represented they could).

WHEREFORE, for the reasons stated in this Response, Plaintiffs Steven Aronson and Matthew Aronson respectfully ask that this Court deny Defendants' Motion, or in the alternative give Plaintiffs leave to file an amended complaint, or any other relief this Court deems just and proper.

RESPECTFULLY SUBMITTED,
Steven Aronson and Matthew Aronson
By:   s/Daniel S. Rubin

Scott C. Frost ARDC #6208276
Daniel S. Rubin ARDC #6293669
HOWARD & HOWARD ATTORNEYS PLLC  Attorney for Plaintiffs
200 S. Michigan Avenue, Suite 1100, Chicago, Illinois 60604, (312) 456-3448
drubin@howardandhoward.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on September 8 , 2021, the foregoing

**Response to Motion to Dismiss** was served via email on the following attorneys of record:

Howard J. Rosenberg at hrosenburg@ksrlaw.com

Matthew S. Ryan at mryan@cotsiriloslaw.com

Margaret G. Nelson at mnelson@foley.com

STEVEN ARONSON, MATTHEW ARONSON

BY: */s/ Daniel S. Rubin*
One of His Attorneys

Scott C. Frost (#ARDC#6208276)
Daniel S. Rubin (ARDC#6293669)
Attorneys for Plaintiff
Howard & Howard Attorneys, PLLC
200 South Michigan Ave., Suite 1100
Chicago, Illinois 60604
(312) 372-4000
sfrost@howardandhoward.com
drubin@howardandhoward.com

4845-3348-6842, v. 1

TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
DAVID H. CHAO (Cal. Bar No. 273953)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1259/4586
    Facsimile: (213) 894-0141
    E-mail:   alexander.schwab@usdoj.gov
             david.chao@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 21-214-MCS |
|      Plaintiff, | <u>PLEA AGREEMENT FOR DEFENDANT</u> <u>ZACHARY JOSEPH HORWITZ</u> |
|          v. | |
| ZACHARY JOSEPH HORWITZ, | |
|      Defendant. | |

    1.   This constitutes the plea agreement between ZACHARY JOSEPH HORWITZ ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.

<u>DEFENDANT'S OBLIGATIONS</u>

    2.   Defendant agrees to:

        a.   At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to count one of the

EXHIBIT 1

1  indictment in <u>United States v. Zachary Joseph Horwitz</u>, CR No. 21-214-

2  MCS, which charges defendant with securities fraud, in violation of

3  15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

4          b.   Not contest facts agreed to in this agreement.

5          c.   Abide by all agreements regarding sentencing contained

6  in this agreement.

7          d.   Appear for all court appearances, surrender as ordered

8  for service of sentence, obey all conditions of any bond, and obey

9  any other ongoing court order in this matter.

10         e.   Not commit any crime; however, offenses that would be

11  excluded for sentencing purposes under United States Sentencing

12  Guidelines ("USSG" or "Sentencing Guidelines") § 4A1.2(c) are not

13  within the scope of this agreement.

14         f.   Be truthful at all times with the United States

15  Probation and Pretrial Services Office and the Court.

16         g.   Pay the applicable special assessment at or before the

17  time of sentencing unless defendant has demonstrated a lack of

18  ability to pay such assessments.

19         h.   Defendant agrees that any and all criminal debt

20  ordered by the Court will be due in full and immediately.  The

21  government is not precluded from pursuing, in excess of any payment

22  schedule set by the Court, any and all available remedies by which to

23  satisfy defendant's payment of the full financial obligation,

24  including referral to the Treasury Offset Program.

25         i.   Complete the Financial Disclosure Statement on a form

26  provided by the USAO and, within 30 days of defendant's entry of a

27  guilty plea, deliver the signed and dated statement, along with all

28  of the documents requested therein, to the USAO by either email at

2

1   usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial

2   Litigation Section at 300 North Los Angeles Street, Suite 7516, Los

3   Angeles, CA 90012.  Defendant agrees that defendant's ability to pay

4   criminal debt shall be assessed based on the completed Financial

5   Disclosure Statement and all required supporting documents, as well

6   as other relevant information relating to ability to pay.

7         j.   Authorize the USAO to obtain a credit report upon

8   returning a signed copy of this plea agreement.

9         k.   Consent to the USAO inspecting and copying all of

10   defendant's financial documents and financial information held by the

11   United States Probation and Pretrial Services Office.

12         l.   Agree that all court appearances, including his change

13   of plea hearing and sentencing hearing, may proceed by video-

14   teleconference ("VTC"), so long as such appearances are authorized by

15   Order of the Chief Judge 20-097 or another order, rule, or statute.

16   Defendant understands that, under the Constitution, the United States

17   Code, the Federal Rules of Criminal Procedure (including Rules 11,

18   32, and 43), he may have the right to be physically present at these

19   hearings.  Defendant understands that right and, after consulting

20   with counsel, voluntarily agrees to waive it and to proceed remotely.

21   Defense counsel also joins in this consent, agreement, and waiver.

22   Specifically, this agreement includes, but is not limited to, the

23   following:

24           i.   Defendant consents under Section 15002(b) of the

25   CARES Act to proceed with his change of plea hearing by VTC.

26           ii.   Defendant consents under Section 15002(b) of the

27   CARES Act to proceed with his sentencing hearing by VTC if personal

28   appearance is deemed by the Court to be unsafe due to COVID-19

3

1    concerns.  The parties agree to use best efforts to conduct the

2    sentencing hearing in person with the Court's approval.

3                   iii. Defendant consents under 18 U.S.C. § 3148 and

4    Section 15002(b) of the CARES Act to proceed with any hearing

5    regarding alleged violations of the conditions of pretrial release by

6    VTC or telephone, if VTC is not reasonably available.

7                            THE USAO'S OBLIGATIONS

8        3.   The USAO agrees to:

9            a.   Not contest facts agreed to in this agreement.

10           b.   Abide by all agreements regarding sentencing contained

11   in this agreement.

12           c.   At the time of sentencing, move to dismiss the

13   remaining counts of the indictment as against defendant.  Defendant

14   agrees, however, that at the time of sentencing the Court may

15   consider any dismissed charges in determining the applicable

16   Sentencing Guidelines range, the propriety and extent of any

17   departure from that range, and the sentence to be imposed.

18           d.   At the time of sentencing, provided that defendant

19   demonstrates an acceptance of responsibility for the offense up to

20   and including the time of sentencing, recommend a two-level reduction

21   in the applicable Sentencing Guidelines offense level, pursuant to

22   USSG § 3E1.1, and recommend and, if necessary, move for an additional

23   one-level reduction if available under that section.

24                            NATURE OF THE OFFENSE

25       4.   Defendant understands that for defendant to be guilty of

26   the crime charged in count one, that is, securities fraud, in

27   violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, the

28   following must be true:

                                    4

(1) defendant willfully used a device or scheme to defraud someone, made an untrue statement of a material fact, failed to disclose a material fact that resulted in making the defendant's statements misleading, or engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person;

(2) defendant's acts were undertaken, statement was made, or failure to disclose was done in connection with the purchase and sale of securities within the meaning of 15 U.S.C. § 78c(a)(10);

(3) defendant directly or indirectly used wire communications in connection with these acts, making this statement, or this failure to disclose; and

(4) defendant acted knowingly.

"Willfully" means intentionally undertaking an act, making an untrue statement, or failing to disclose for the wrongful purpose of defrauding or deceiving someone.  Acting willfully does not require that the defendant know that the conduct was unlawful.

A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making the decision to purchase securities.

It is not necessary that an untrue statement passed through or over the wire communications so long as the wire communications were used as a part of the transaction.

It is not necessary that defendant made a profit or that anyone actually suffered a loss.

<u>PENALTIES AND RESTITUTION</u>

5.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 15 U.S.C. §§ 78j(b),

5

78ff and 17 C.F.R. § 240.10b-5 is: twenty years of imprisonment; a three-year period of supervised release; a fine of $5 million or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6.   Defendant understands that defendant will be required to pay full restitution to the victims of the offense to which defendant is pleading guilty and agrees to make such restitution.  Defendant understands and agrees that although a violation of 18 U.S.C. § 1343 does not constitute the count of conviction in this plea agreement, this plea agreement relates to such a charge, which is an offense against property, within the meaning of 18 U.S.C. § 3663A(c)(2), thereby bringing this offense within the ambit of 18 U.S.C. § 3663A. Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victims of the offense to which defendant is pleading guilty, and in amounts greater than those alleged in the count to which defendant is pleading guilty, so long as such persons qualify as "victims," within the meaning of 18 U.S.C. § 3663A(a)(2), of defendant's offense and/or relevant conduct.  In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in USSG § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any counts dismissed pursuant to this agreement as well as all relevant conduct, as defined in USSG § 1B1.3, in connection with those counts.  Defendant understands that the Court may impose, and the USAO reserves the right to seek, restitution on any basis permitted by law.

7.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

8.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

9.   Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future.

1    Defendant understands that while there may be arguments that
2    defendant can raise in immigration proceedings to avoid or delay
3    removal, removal is presumptively mandatory and a virtual certainty
4    in this case.  Defendant further understands that removal and
5    immigration consequences are the subject of a separate proceeding and
6    that no one, including his attorney or the Court, can predict to an
7    absolute certainty the effect of his conviction on his immigration
8    status.  Defendant nevertheless affirms that he wants to plead guilty
9    regardless of any immigration consequences that his plea may entail,
10   even if the consequence is automatic removal from the United States.

11                              FACTUAL BASIS

12        10.  Defendant admits that defendant is, in fact, guilty of the
13   offense to which defendant is agreeing to plead guilty.  Defendant
14   and the USAO agree to the statement of facts provided below and agree
15   that this statement of facts is sufficient to support a plea of
16   guilty to the charge described in this agreement and to establish the
17   Sentencing Guidelines factors set forth in paragraph 12 below but is
18   not meant to be a complete recitation of all facts relevant to the
19   underlying criminal conduct or all facts known to either party that
20   relate to that conduct.

21        In or about 2013, defendant founded 1inMM Capital, LLC ("1inMM
22   Capital"), which defendant promoted as a film distribution company.
23   1inMM Capital's principal place of business was in Los Angeles,
24   California.

25        Beginning no later than in or about March 2014, and continuing
26   through at least on or about April 6, 2021, in Los Angeles County,
27   within the Central District of California, and elsewhere, defendant
28   knowingly and willfully, by the use of the means and

instrumentalities of interstate commerce, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, by: (1) employing a scheme to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of securities (the "investors").  Defendant did so by making and causing to be made materially false and fraudulent statements and material omissions to the investors about defendant and 1inMM Capital's use of their investments.

In execution of the fraudulent scheme, defendant made offers to investors to purchase promissory notes issued by 1inMM Capital, which notes constituted "securities" within the meaning of the Securities Exchange Act of 1934, by making a series of false and misleading statements and by using various deceptive contrivances.  Each of these statements and contrivances was material to investors. Specifically, defendant falsely represented to investors that 1inMM Capital would purchase distribution rights to certain films, which defendant falsely claimed 1inMM Capital would then profitably license to online streaming platforms such as HBO and Netflix for further distribution in regions outside the United States.  To raise funds for 1inMM Capital's purported business activities, defendant solicited investments from the investors by offering to sell them promissory notes issued by 1inMM Capital and signed by defendant.

The promissory notes guaranteed a specified payment on a specified maturity date, typically six or twelve months in the future.  Each note listed the principal amount of money borrowed, which typically ranged from approximately $35,000 to $1.5 million, as well as the specified amount to be paid at maturity, a calculated return that ranged from 25 to 45 percent.

In connection with the sale of these promissory notes, defendant falsely represented that 1inMM Capital would use the principal amount of money invested pursuant to each note to purchase distribution rights for the film(s) specified as collateral for the note. Defendant also falsely represented that 1inMM Capital would satisfy its obligations under each note through the profits that 1inMM Capital would obtain by acquiring and licensing the distribution rights to the film(s) specified in each note.  Each note contained an assignment of rights provision that listed the specific film(s) that would serve as collateral for the note.  The assignment of rights provision in each note contained express representations and warranties that 1inMM Capital was the sole and exclusive owner of the rights to the listed film(s).  However, as defendant then knew, his representations concerning 1inMM Capital's business activities and the promissory notes themselves were false and deceptive because 1inMM Capital generally did not and would not acquire or possess the film distribution rights for the films specified as collateral in the promissory notes, and 1inMM Capital did not and would not enter into any distribution agreements with the online streaming platforms for these specified films.

In furtherance of the scheme, defendant also provided investors with fraudulent copies of purported license agreements between 1inMM

Capital and the sales agents for the production companies of the films identified in the promissory notes.  In fact, as defendant then knew, these license agreements were fake because 1inMM Capital had not acquired the film distribution rights that constituted the purported collateral for the promissory notes and had not entered into the asserted license agreements with the identified sales agents.

In furtherance of the scheme, defendant also falsely represented to investors that online streaming platforms had already entered or committed to enter into distribution agreements with 1inMM Capital. Defendant provided investors with copies of these purported distribution agreements when, in fact, as defendant knew, 1inMM Capital had not entered into the asserted distribution agreements with the online streaming platforms and the purported copies of the distribution agreements were fake.

In furtherance of the scheme and to lull the investors into believing their funds were safely invested as he had promised, defendant falsely reassured investors that any missed payments on promissory notes were caused by the actions of the online streaming platforms, and that payment on the notes would resume.  To support these false claims, defendant sent the investors emails and text messages regarding progress addressing the actions purportedly causing the missed payments and the resumption of payments, which defendant claimed had been sent to him by representatives of the online streaming platforms.  In fact, as defendant then knew, he had not been in communication with the online streaming platforms, and the correspondence he was supposedly forwarding was fake.

Through the fraudulent scheme, defendant sold hundreds of promissory notes issued by 1inMM Capital and thereby fraudulently obtained at least $650 million from at least five major groups of private investors.  Defendant understood that these investor groups derived their investments, in part, from various sub-investors who did not have direct contractual agreements with 1inMM Capital, and in fact there were more than 250 such sub-investors (subject to the reservation of rights in paragraph 12 below).  Defendant did not use the invested money as promised but instead used the money to make payments to prior investors, maintain 1inMM Capital's facade of legitimate operations, make disbursements to himself and entities he controlled, and otherwise finance his own lavish lifestyle. Beginning in or about December 2019, 1inMM Capital began defaulting on all of its outstanding promissory notes.  Thus, to date, defendant, through 1inMM Capital, is in default to investors on a total outstanding principal amount of approximately $230.36 million, and defendant's scheme has caused substantial financial hardship to at least five investors.

For the purpose of executing the above-described scheme to defraud, and in furtherance of the manipulative and deceptive devices described above, defendant directly and indirectly caused the use of instrumentalities of interstate commerce in connection with the purchase and sale of securities.  For example, on or about December 14, 2018, defendant caused the interstate wire transfer of approximately $1,425,500 from Investor 1, located in Illinois, to the 1inMM Capital Account, located in California, to purchase a promissory note secured by the assignment of rights to the film "Active Measures."

1

<u>SENTENCING FACTORS</u>

2       11.  Defendant understands that in determining defendant's

3   sentence the Court is required to calculate the applicable Sentencing

4   Guidelines range and to consider that range, possible departures

5   under the Sentencing Guidelines, and the other sentencing factors set

6   forth in 18 U.S.C. § 3553(a).  Defendant understands that the

7   Sentencing Guidelines are advisory only, that defendant cannot have

8   any expectation of receiving a sentence within the calculated

9   Sentencing Guidelines range, and that after considering the

10  Sentencing Guidelines and the other § 3553(a) factors, the Court will

11  be free to exercise its discretion to impose any sentence it finds

12  appropriate up to the maximum set by statute for the crime of

13  conviction.

14      12.  Defendant and the USAO agree to the following applicable

15  Sentencing Guidelines factors:

16      Base Offense Level             7             USSG § 2B1.1(a)(1)

17      Loss of more than $150
    million but not more than
18      $250 million             +26          USSG § 2B1.1(b)(1)(N)

19      Substantial Financial   +4          USSG § 2B1.1(b)(2)(B)
        Hardship to 5 or more victims
20
        Sophisticated Means     +2    USSG § 2B1.1(b)(2)(10)(C)
21

22  Defendant and the USAO reserve the right to argue that additional

23  specific offense characteristics, adjustments, and departures under

24  the Sentencing Guidelines are appropriate.  By way of example, but

25  not limitation, the government reserves the right to argue that

26  defendant's offense and relevant conduct resulted in substantial

27  financial hardship to 25 or more victims, and defendant reserves the

28

1  right to contest the number of sub-investors of the victim investor

2  groups as referenced above at page 12.

3      13.  Defendant understands that there is no agreement as to

4  defendant's criminal history or criminal history category.

5      14.  Defendant and the USAO reserve the right to argue for a

6  sentence outside the sentencing range established by the Sentencing

7  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

8  (a)(2), (a)(3), (a)(6), and (a)(7).

9                   <u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

10     15.  Defendant understands that by pleading guilty, defendant

11  gives up the following rights:

12          a.   The right to persist in a plea of not guilty.

13          b.   The right to a speedy and public trial by jury.

14          c.   The right to be represented by counsel –– and if

15  necessary have the Court appoint counsel -- at trial.  Defendant

16  understands, however, that, defendant retains the right to be

17  represented by counsel –– and if necessary have the Court appoint

18  counsel –– at every other stage of the proceeding.

19          d.   The right to be presumed innocent and to have the

20  burden of proof placed on the government to prove defendant guilty

21  beyond a reasonable doubt.

22          e.   The right to confront and cross-examine witnesses

23  against defendant.

24          f.   The right to testify and to present evidence in

25  opposition to the charges, including the right to compel the

26  attendance of witnesses to testify.

27

28

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF APPEAL OF CONVICTION

16.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

17.  Defendant agrees that, provided the Court imposes a total term of imprisonment within the statutory maximum, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, so long as it is less than $235 million; (f) the term of probation or supervised release imposed by the Court, provided it is within the

statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

18. The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment of no less than 235 months' imprisonment, the USAO gives up its right to appeal any portion of the sentence, with the exception that the USAO reserves the right to appeal the amount of restitution ordered.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

19. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>RESULT OF VACATUR, REVERSAL, OR SET-ASIDE</u>

20.  Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

21.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

22.  Defendant agrees that if defendant, at any time after the effective date of the agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

23.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

17

1        a.   Defendant agrees that any applicable statute of

2   limitations is tolled between the date of defendant's signing of this

3   agreement and the filing commencing any such action.

4        b.   Defendant waives and gives up all defenses based on

5   the statute of limitations, any claim of pre-indictment delay, or any

6   speedy trial claim with respect to any such action, except to the

7   extent that such defenses existed as of the date of defendant's

8   signing this agreement.

9        c.   Defendant agrees that: (i) any statements made by

10  defendant, under oath, at the guilty plea hearing (if such a hearing

11  occurred prior to the breach); (ii) the agreed to factual basis

12  statement in this agreement; and (iii) any evidence derived from such

13  statements, shall be admissible against defendant in any such action

14  against defendant, and defendant waives and gives up any claim under

15  the United States Constitution, any statute, Rule 410 of the Federal

16  Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

17  Procedure, or any other federal rule, that the statements or any

18  evidence derived from the statements should be suppressed or are

19  inadmissible.

20      COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

21                    OFFICE NOT PARTIES

22  24.   Defendant understands that the Court and the United States

23  Probation and Pretrial Services Office are not parties to this

24  agreement and need not accept any of the USAO's sentencing

25  recommendations or the parties' agreements to facts or sentencing

26  factors.

27  25.   Defendant understands that both defendant and the USAO are

28  free to: (a) supplement the facts by supplying relevant information

1   to the United States Probation and Pretrial Services Office and the

2   Court, (b) correct any and all factual misstatements relating to the

3   Court's Sentencing Guidelines calculations and determination of

4   sentence, and (c) argue on appeal and collateral review that the

5   Court's Sentencing Guidelines calculations and the sentence it

6   chooses to impose are not error, although each party agrees to

7   maintain its view that the calculations in paragraph 12 are

8   consistent with the facts of this case.  While this paragraph permits

9   both the USAO and defendant to submit full and complete factual

10  information to the United States Probation and Pretrial Services

11  Office and the Court, even if that factual information may be viewed

12  as inconsistent with the facts agreed to in this agreement, this

13  paragraph does not affect defendant's and the USAO's obligations not

14  to contest the facts agreed to in this agreement.

15      26.  Defendant understands that even if the Court ignores any

16  sentencing recommendation, finds facts or reaches conclusions

17  different from those agreed to, and/or imposes any sentence up to the

18  maximum established by statute, defendant cannot, for that reason,

19  withdraw defendant's guilty plea, and defendant will remain bound to

20  fulfill all defendant's obligations under this agreement.  Defendant

21  understands that no one -- not the prosecutor, defendant's attorney,

22  or the Court -- can make a binding prediction or promise regarding

23  the sentence defendant will receive, except that it will be within

24  the statutory maximum.

25                      <u>NO ADDITIONAL AGREEMENTS</u>

26      27.  Defendant understands that, except as set forth herein,

27  there are no promises, understandings, or agreements between the USAO

28  and defendant or defendant's attorney, and that no additional

19

1  promise, understanding, or agreement may be entered into unless in a

2  writing signed by all parties or on the record in court.

3  　　　　PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

4  　　28.  The parties agree that this agreement will be considered

5  part of the record of defendant's guilty plea hearing as if the

6  entire agreement had been read into the record of the proceeding.

7  AGREED AND ACCEPTED

8  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
9  CALIFORNIA

10  TRACY L. WILKISON
    Acting United States Attorney
11

12  _____           9/1/2021
    _____
13  ALEXANDER B. SCHWAB                      Date
    DAVID H. CHAO
14  Assistant United States Attorneys

15  _____           09/01/2021
    _____
16  ZACHARY JOSEPH HORWITZ                    Date
    Defendant

17

18  _____           9.1.2021
    _____
    ANTHONY PACHECO                          Date
19  RYAN S. HEDGES
    Attorneys for Defendant
20  ZACHARY JOSEPH HORWITZ

21

22

23

24

25

26

27

28

                              20

1                             CERTIFICATION OF DEFENDANT

2       I have read this agreement in its entirety.  I have had enough

3 time to review and consider this agreement, and I have carefully and

4 thoroughly discussed every part of it with my attorney.  I understand

5 the terms of this agreement, and I voluntarily agree to those terms.

6 I have discussed the evidence with my attorney, and my attorney has

7 advised me of my rights, of possible pretrial motions that might be

8 filed, of possible defenses that might be asserted either prior to or

9 at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10 of relevant Sentencing Guidelines provisions, and of the consequences

11 of entering into this agreement.  No promises, inducements, or

12 representations of any kind have been made to me other than those

13 contained in this agreement.  No one has threatened or forced me in

14 any way to enter into this agreement.  I am satisfied with the

15 representation of my attorney in this matter, and I am pleading

16 guilty because I am guilty of the charge and wish to take advantage

17 of the promises set forth in this agreement, and not for any other

18 reason.

19

20 ZACHARY JOSEPH HORWITZ             09/01/2021

    Defendant                          Date

21

22

23

24

25

26

27

28

1               CERTIFICATION OF DEFENDANT'S ATTORNEY

2      I am one of ZACHARY JOSEPH HORWITZ's attorneys.  I have

3 carefully and thoroughly discussed every part of this agreement with

4 my client.  Further, I have fully advised my client of his rights, of

5 possible pretrial motions that might be filed, of possible defenses

6 that might be asserted either prior to or at trial, of the sentencing

7 factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing

8 Guidelines provisions, and of the consequences of entering into this

9 agreement.  To my knowledge: no promises, inducements, or

10 representations of any kind have been made to my client other than

11 those contained in this agreement; no one has threatened or forced my

12 client in any way to enter into this agreement; my client's decision

13 to enter into this agreement is informed and voluntary; and the

14 factual basis set forth in this agreement is sufficient to support my

15 client's entry of a guilty plea pursuant to this agreement.

16

17 ANTHONY PACHECO                           9·1·2021

RYAN S. HEDGES                          Date

18 Attorneys for Defendant

ZACHARY JOSEPH HORWITZ

19

20

21

22

23

24

25

26

27

28