# EXHIBIT A

Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice* to be filed)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>Defendants. | Case No. 2:21-cv-02927-CAS(GJSx)<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FIRST QUARTER 2022)**<br><br>Judge: Hon. Christina A. Snyder<br>Courtroom: 8D |

# TABLE OF CONTENTS

I. BACKGROUND INFORMATION ................................................................. 2
    A. Introduction ........................................................................................... 2
    B. The Receivership .................................................................................. 3

II. INITIAL ACTIVITY OF THE RECEIVER ................................................... 4
    A. Receivership Objectives ........................................................................ 4
    B. Description of Known Assets ................................................................ 5
        1. Cash Proceeds Related to Sale of 9615 Bolton Rd. ................... 5
        2. Furniture ..................................................................................... 6
        3. Rogue Black, LLC ..................................................................... 6
        4. LayJax Ventures, LLC ............................................................... 8
    C. Accounting of Receipts and Disbursements .......................................... 9
    D. Retention of Counsel ............................................................................. 9

III. INVESTIGATION AND PURSUIT OF UNKNOWN ASSETS ................. 10
    A. Meeting with the SEC, USAO and FBI .............................................. 10
    B. Status of Obtaining Bank Records and Other Requests for Information ........................................................................................... 11
    C. Forensic Accounting ........................................................................... 12
    D. Potential Litigation .............................................................................. 12

IV. INVESTORS AND THE ANTICIPATED RECOVERY PROCESS .......... 13
    A. Summary of the 1inMM Investment Structure and its Investors ...... 13
    B. Creation of Website to Communicate with End-Investors ................ 13
    C. Future End-Investor Claims Process ................................................... 14
    D. Litigation Commenced by End-Investors ........................................... 14

V. NOTICE ......................................................................................................... 17

VI. CONCLUSION ............................................................................................. 18

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

Michele Vives, the duly appointed permanent receiver (the "Receiver") of 1inMM Capital, LLC and its subsidiaries and affiliates ("1inMM"), and over assets that are attributable to funds derived from investors or clients of the Defendants or were fraudulently transferred by the Defendants (collectively, the "Receivership Estate"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("Order of Appointment") entered on January 14, 2022, hereby submits this quarterly report (the "Report") for the period January 14, 2022 through March 31, 2022. The Report details the Receiver's activities and findings over the past partial quarter to protect and administer the receivership estate, identify new assets and lay out the Receiver's general strategy to maximize the recovery for the benefit of harmed investors.

## I. BACKGROUND INFORMATION

### A. Introduction

The preamble to this receivership mirrors that of a Hollywood movie script. For the sake of clarity, the following will provide a brief history of events leading up to the ultimate appointment of the Receiver. On April 4, 2021, the Securities and Exchange Commission ("SEC") filed a complaint against Zachary J. Horwitz ("Horwitz") and 1inMM Capital, LLC ("1inMM") alleging Horwitz conducted an offering fraud and Ponzi scheme in violation of federal securities law.

The government alleged that, from March 2014 through at least December 2019, Horwitz, through 1inMM, raised over $690 million from investors selling promissory notes issued by 1inMM purporting to invest in various movie film productions. Horwitz and 1inMM raised that staggering amount of money using five main feeder funds or aggregators—JJMT Capital LLC, Movie Fund LLC, SAC Advisory Group, LLC, Vausse Films and Pure Health Enterprises (collectively, the "Principal Aggregators")—which are believed to have raised funds from more than 200 downstream individual investors, some of whom raised funds from further downstream investors (collectively, the "End-Investors"). As a result, most of the

End-Investors dealt only with a Principal Aggregator, and thus had only indirect dealings with 1inMM.

Returns in excess of 35% were assured to the End-Investors on investments which offered to finance the acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies including Netflix and Home Box Office ("HBO"). To substantiate deals he had with HBO and Netflix, Horwitz purportedly touted fictitious movie distribution agreements, fake emails and the like. In late 2019, Horwitz began defaulting on outstanding notes issued by 1inMM, blaming HBO and Netflix for their apparent refusal to pay for the distribution rights. From early 2020 to March 2021, Horwitz purportedly promised investors that he was on the verge of reaching agreements with HBO and Netflix and would soon be able to repay investors. Soon thereafter, on April 4, 2021, the SEC filed its complaint against Horwitz. Many of the End-Investors have commenced their own lawsuits (discussed herein at Part IV.D).

On October 4, 2021, in a parallel criminal action, Horwitz pled guilty to one count of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, in *United States v. Horwitz*, No. 2:21-cr-00214-MCS-1 (the "Criminal Action"). Horwitz appears to have, in essence, operated a massive Ponzi scheme where new investor monies were used to pay off old investor obligations with no real underlying business enterprise. Thus far, it has been suggested that Horwitz acted alone and is the sole person implicated in administering the alleged scheme. Over 200 investors appear to have been defrauded out of potentially hundreds of millions of dollars. On February 14, 2022, Horwitz was sentenced in the Criminal Action to 240 months of imprisonment and ordered to pay restitution in the total amount of $230,361,884 to the Principal Aggregators. The background to these investment entities will be more fully discussed further in this Report.

**B.     The Receivership**

This particular receivership is unique in two respects: (1) the defendant,

Horwitz, has already pled guilty to one count of securities fraud in the Criminal Action prior to the Receiver's appointment, and (2) the Receiver's appointment on January 14, 2022 occurred approximately 10 months following the commencement of this civil action by the SEC.

The intention behind the timing to appoint the Receiver, as outlined in the Order of Appointment, was that the SEC determined a receiver would benefit the estate in managing the known assets, which include ongoing businesses, and to identifying any other significant, yet unknown, assets that may be available to recover and compensate harmed End-Investors. Accordingly, the Receiver believes that her principal charge is to make the End-Investors in Defendants' scheme as whole as possible, as opposed to merely collecting assets to pay down the restitution judgment entered in the Criminal Action in favor of the Principal Aggregators.[1]

## II. INITIAL ACTIVITY OF THE RECEIVER

### A. Receivership Objectives

The Receiver's primary goal has been to gather and compile all relevant information with a focus on two main objectives: (1) administering and maximizing the value of the currently known assets, and (2) identifying and locating additional, currently unknown assets.

The first item, the known assets, are believed to be limited in terms of monetary value when compared to the magnitude of the scheme. While anticipated to provide some recovery, the known assets are thus far anticipated to recover potentially $3-4 million—hundreds of millions less than what investors purportedly lost. The known assets are discussed in more detail below along with the Receiver's plan to administer them.

---

[1] This is particularly because the Receiver likely has substantial litigation claims to bring against the Principal Aggregators, other feeder funds and their respective insiders.

The limited value of the known assets underscores the importance of carrying out the Court's further charge – identifying and marshaling unknown assets to make the defrauded investors as whole as possible – in a cost efficient and expeditious manner. Unknown assets may come in various forms including but not limited to money or property that have purposefully been concealed and hidden, recoveries from litigation to avoid fraudulent transfers to various persons and entities, including net winners of the Ponzi scheme, and potentially others.

This Report will outline the Receiver's plan to carry out these primary objectives successfully.

### B. Description of Known Assets

The known assets in the estate currently include: (1) cash proceeds related to the sale of the 9615 Bolton Rd. property, (2) furniture from the 9615 Bolton Rd. property, (3) Rogue Black, LLC and (4) LayJax Ventures, LLC. The first asset relates purely to cash held with the Court Registry Investment System ("Court Registry"). The third and fourth known assets relate to ongoing businesses in which 1inMM funds were used to invest in other various business enterprises.

#### 1. *Cash Proceeds Related to Sale of 9615 Bolton Rd.*

Shortly after the SEC filed its enforcement action against the Defendants, Horwitz's home, located at 9615 Bolton Road, Los Angeles, CA 90034 (the "Bolton Property"), was sold pursuant to a joint *Ex Parte* Application made by the SEC and Horwitz. The Bolton Property was sold for a gross sales price of $5,930,000.00. On May 10, 2021, the net sales proceeds of $1,417,517.16 (the "Bolton Proceeds") were deposited into the Court Registry, which is administered by the Clerk of the Court.

Though it was clearly contemplated by the SEC's motion to appoint a receiver that the Receiver would take possession of and control over the Bolton Proceeds, during the first quarter the Receiver was unsuccessful in her attempts to obtain the release of those funds from the Clerk. Accordingly, on March 2, 2022, the Receiver filed a motion requesting the Court to direct the Clerk of the Court to release to the

Receiver the Bolton Proceeds. On March 16, 2022, the Court entered an order directing the Clerk to turn over the Bolton Proceeds to the Receiver. The Clerk, however, determined that the language in the turnover order was not sufficiently specific. When the quarter ended, the Receiver was awaiting entry of an amended turnover order by the Court that would address the Clerk's concerns.[2]

### 2. *Furniture*

The Receiver has been advised that all of the furniture and other furnishings that were at the Bolton Property are in a storage unit at a location that is currently unknown to the Receiver. The Receiver understands that this furniture is of high-end quality that may have substantial resale value. The Receiver is attempting to obtain control over this furniture and other material to liquidate it and reduce it to cash for the benefit of the Receivership Estate.

### 3. *Rogue Black, LLC*

Rogue Black, LLC ("Rogue Black") is a film company that financed and produced independent films. Other than Horwitz's association, Rogue Black itself is not believed to have been involved with the fraudulent conduct alleged in this action. Rogue Black was co-owned by another individual, however the co-owner is not a party to this action and is not alleged or believed to have been involved in, or even aware of, Horwitz's alleged fraud. As the co-owner was not involved in the alleged scheme, and following their request not to be identified, Rogue Black's co-owner will be referenced herein as "RB Co-Owner".

Rogue Black was formed in June 2017 with a 50% ownership held by ZJH Enterprises, LLC (a company believed to have been formed and solely owned by Horwitz) and the other 50% held by RB Co-Owner. The purpose behind Rogue

---

[2] The Clerk has since wired the Bolton Proceeds to the Receiver. The Receiver will address this in greater detail in her second quarterly report.

Case No. 2:21-cv-02927-CAS(GJSx)
QUARTERLY REPORT OF RECEIVER MICHELE VIVES
(FIRST QUARTER 2022)

6

Black was to produce and finance independent films.

### a. Rogue Black Operations and Purpose

From the beginning, it was agreed that Horwitz would be the financial source to fund film productions for Rogue Black. RB Co-Owner's role, on the other hand, was the sweat equity portion. RB Co-Owner would introduce various film entertainment projects to the company at their development stage for potential financing and/or production opportunities. RB Co-Owner would also effectuate the actual production of the films, once invested, sometimes acting in other various capacities such as the film's co-writer or director. Attached as **Exhibit A** is a copy of the operating agreement with RB Co-Owner's name redacted.

Rogue Black served another purpose to Horwitz: to further his career as an actor and provide him opportunities to engage with industry filmmakers and production entities beneficial to establishing his own career in the entertainment industry. This assertion is confirmed in a consulting agreement entered into between 1inMM and RB Co-Owner . Horwitz was further cast in a role for one of the films financed by Rogue Black titled *The Gateway*. In essence, Horwitz used investor money in an attempt to further his ambitions of becoming a Hollywood movie star.

### b. Rogue Black Films, Investments and Current Cash

Records show that Horwitz caused 1inMM to invest approximately $21 million into Rogue Black during the period 2017 through 2021. Rogue Black went on to produce and complete a total of eight films (collectively, the "Produced Films") during that time which are summarized in **Exhibit B**. Investments ranged from as little as $225,000, as was the case for a movie *Georgetown*, to as much as $5,425,000 for the film *Minamata*, which starred Johnny Depp. As of March 31, 2022, Rogue Black had cash on hand of $548,303.00 held in a segregated bank account. Control of this account is currently being transitioned to the Receiver.

### c. Rogue Black Outlook and Next Steps

Rogue Black was often not the only financing agent on the Produced Films.

As typical in film productions, other investors or lenders were also involved in order to fully fund the film. Unfortunately, as with many independent films, not all of the Produced Films have generated profits. At this time, it is anticipated that only a portion of Rogue Black's principal investment will be recovered. RB Co-Owner currently estimates that, over the next two to three years, Rogue Black will collect approximately $1,500,000 to $2,500,000 on account of the Produced Films.

The Produced Films are on the tail-end of their distribution and, for the most part, the only remaining task is to collect on the portion of gross receipts to which Rogue Black is entitled. Film financing is notoriously complex, as is the case here. In each production, a "waterfall"—or payment prioritization system—is typical. The waterfall outlines payment of various vendors and participants in a particular order from the generated gross receipts of the film. Five of the eight films in Rogue Black are known to have entered into a collections account management agreement, whereby an agency was appointed to administer the collection and distribution of collected gross receipts related to each film based on the agreed upon waterfall. At this time, the Receiver is currently reviewing multiple options to ensure that the Receivership Estate collects everything that Rogue Black is entitled to receive on account of its investments resulting in the Produced Films.

### 4. *LayJax Ventures, LLC*

LayJax Ventures, LLC ("LayJax") is an angel investment company which invested in early startup business ventures. LayJax is not believed to have been involved with the fraudulent conduct alleged in this action. Further, LayJax's co-manager is not a party to this action, and they too are not alleged or believed to have been involved in, or even aware of, Horwitz's alleged fraud. Therefore, LayJax's co-manager will be referred to herein as "LJ Co-Manager".

LayJax was formed by Horwitz and LJ Co-Manager in 2018. Beginning in June 2018 through May 1, 2020, LayJax invested approximately $2.5 million into twelve different startup business ventures (the "LayJax Investments"), all of which

appears to have been transferred to LayJax from 1inMM.

The businesses in which LayJax invested are broad and diverse, ranging from baby monitoring to wine beverages to AI-metaverse technology to anti-acne patches. Capital investments ranged from $25,000 up to $800,000. Attached as **Exhibit C** is a summary of each of the businesses in which LayJax provided funding along with additional detail. At this time, generic company descriptions are being used in place of each company's name to avoid them becoming associated with the alleged fraudulent scheme.

In the Receiver's discussions with LJ Co-Manager, it appears some of the LayJax Investments are struggling and unlikely to provide significant sources of recovery. There are, however, a couple of the investments that may eventually lead to some a degree of return, though it is presently too preliminary to make any specific projections. The Receiver will continue to investigate and monitor all LayJax Investments and keep the Court apprised of any significant developments.

### C. Accounting of Receipts and Disbursements

During the first quarter 2022, no funds had yet come under the direct control of the Receiver. Accordingly, there are no cash receipts or cash disbursements to report.[3]

### D. Retention of Counsel

On February 3, 2022, the Receiver filed an unopposed motion to the Court requesting an order authorizing the Receiver to employ Katten Muchin Rosenman LLP ("Katten") as her counsel retroactive to January 14, 2022. On February 22, 2022, the Court granted the Receiver's motion. During the first quarter, Katten has assisted the Receiver and her team in carrying out her duties and enforcing her rights

---

[3] The Receiver has, however, had receipts and made disbursements during the second quarter 2022, which the Receiver will address in her second quarterly report.

under the Order of Appointment.

## III. INVESTIGATION AND PURSUIT OF UNKNOWN ASSETS

### A. Meeting with the SEC, USAO and FBI

As previously mentioned, this receivership is slightly unique with a criminal investigation already completed and a defendant that has pled guilty to securities violations. In obtaining a conviction, the various regulators and governmental agencies carried out a significant amount of investigatory work. Additionally, the SEC had performed a good deal of accounting work leading up to their initial complaint.

Accordingly, the Receiver believed it would be advantageous to meet with the various regulators and investigators to review objective information already gathered and compiled. On March 23, 2022, the Receiver and her team met with lead investigators from the SEC, U.S. Attorney's Office ("USAO") and the Federal Bureau of Investigation (collectively, the "Investigatory Agencies") at the SEC's offices in Los Angeles. As the Investigatory Agencies already had documents and information in their possession that would likely assist the Receiver with her duties, the Receiver asked for this meeting in an effort to avoid duplicating or reconstructing their efforts.

The meeting proved fruitful; representatives of the Investigatory Agencies were helpful and reasonably forthcoming.[4] The Receiver and her professionals now have a better understanding of what the Investigatory Agencies had already discovered, as well as what information still remained unknown. Because the alleged Ponzi scheme and various fraudulent actions were apparently so obvious, the Investigatory Agencies advised that they did not need to perform deep and protracted

---

[4] The USAO and the FBI advised that principles of grand jury secrecy prevented them from sharing their underlying investigative materials with the Receiver. Fed. R. Crim. P. 6(e).

investigations to prove up their case against the defendants. This appears to be supported by the swift guilty plea of Horwitz in the Criminal Action.

As a consequence, only the most elementary aspects of the purported fraud is currently known. Many questions, which are essential to the Receiver's duties but not necessarily critical to the Investigatory Agencies' investigations, still exist. These include, for example: How many End-Investors are there? Who are the End-Investors? How much exactly are the End-Investors owed? If there is potentially more than $230 million of principal investment still owed, where did all that money go? Did Horwitz have assets that the Investigatory Agencies did not detect? The Receiver believes the Court has tasked her with finding the answers to these questions, so as to make the End-Investors as whole as possible.

### B. Status of Obtaining Bank Records and Other Requests for Information

During the first quarter, the Receiver issued demands for and received all bank statements for seven known bank accounts related to 1inMM and its affiliates. The bank statements span the period 2013 through 2022 and include over 10,000 financial transactions which are being analyzed as further detailed in the Forensic Accounting section below. As of the end of March 2022, requests for additional information on specific wire transactions are still pending which, once received, will complete the bank transaction database for known accounts. However, other relevant bank accounts that are currently unknown may exist. The search for which is a part of the Receiver's investigation.

In total, the Receiver has sent subpoenas and related information requests to thirteen financial institutions, six individuals/entities of interest, two technology companies holding relevant data and one law firm. The Receiver expects to receive responses at various times during the second quarter. Further requests and subpoenas are anticipated as the Receiver discovers new information.

//

### C. Forensic Accounting

Performing a forensic accounting is an indispensable cornerstone to this receivership. The SEC's complaint alleges that over $690 million was invested into 1inMM and investors have been left with more than $234 million in unreturned principal. With the limited value of the currently known assets, the fundamental question arises: where did the rest of the money go? A forensic accounting provides at least three critical benefits:

- Identifying currently unknown asset purchases or fund transfers to accounts outside the known estate that may provide sources for recoveries;
- Identifying key individuals or entities that may have integral information or potentially themselves be sources for recovery; and
- Providing detailed information on the amount of funds invested by investors, the amount of funds paid back to investors, and the shortfall or gains made by individual investors.

The Receiver is still in the preliminary stages of her forensic accounting work, which will require the review of nearly 10,000 financial transactions. The Receiver's team is extremely experienced in carrying out forensic accounting, particularly on Ponzi schemes, and has specialized software allowing for the efficient and expeditious review of a large amount of transaction data. The Receiver expects to present the preliminary results of this analysis in her next report.

That said, the Receiver has already made some staggering discoveries. For instance, the Receiver has determined that during the years 2014 through 2021—the approximate duration of the Ponzi scheme—**_more than $200 million_** flowed through Horwitz's personal bank account. An overwhelming majority of these funds originated from 1inMM's operating account.

### D. Potential Litigation

As an additional source of recovery to benefit harmed End-Investors, the Receiver and her team are considering commencing litigation under various theories. During the second quarter, the Receiver expects to send demand letters to multiple

persons and entities who received transfers that the Receiver believes are avoidable under the California Voidable Transactions Act and other applicable law.

## IV. INVESTORS AND THE ANTICIPATED RECOVERY PROCESS

### A. Summary of the 1inMM Investment Structure and its Investors

Investments in 1inMM relied heavily on personal relationships and word-of-mouth referrals to obtain investors. Funds are believed to have been primarily raised from the five Principal Aggregators, namely JJMT Capital LLC, Movie Fund LLC, SAC Advisory Group, LLC, Vausse Films and Pure Health Enterprises. These aggregators are believed to have raised funds from more than 200 End-Investors, some of whom raised funds from further downstream End-Investors.

It is not yet fully understood how many End-Investors were a part of each aggregator group and how much they invested. Identifying each of the individual downstream End-Investors, how much money they each invested and how much money they had received back, is a key focus of the Receiver. The Receiver will obtain this information through three sources: (1) subpoenas to the Principal Aggregators and others to obtain investor records and oral testimony, (2) the forensic accounting and (3) an eventual investor claims procedure.

The Receiver is still in the preliminary stages of this investigation. However, as additional information is obtained it will be shared with the Court through subsequent reports filed by the Receiver. Investors will also be made aware of a website the Receiver has created to be the main source of information dissemination as detailed further below.

### B. Creation of Website to Communicate with End-Investors

To communicate effectively and efficiently with the numerous End-Investors in this matter, the Receiver worked on building a website for that purpose (the "Website"). The Website—www.1inMMReceivership.com—is anticipated to launch in mid-April 2022, and will provide basic information for the End-Investors. That information should include, for example, the background to the receivership,

selected case documents filed with the Court and answers to frequently asked questions (including both general receivership questions and specific questions related to this matter). The Website will also include a tool for investors to contact and provide information to the Receiver.

### C. Future End-Investor Claims Process

As noted above, the Receiver perceives her primary charge to be making the End-Investors as whole as possible. To that end, the Receiver anticipates eventually proposing that the Court approve a claims filing, reconciliation and allowance process.

With the Receiver's investigation and asset recovery process still in its nascency, however, it is premature to propose such claims process at this time. Once the Receiver has a better understanding of the creditor body and assets likely available for distribution, the Receiver will propose a claims process and an equitable distribution plan which best addresses the harm caused to injured End-Investors.

### D. Litigation Commenced by End-Investors

As part of her initial investigation, the Receiver identified numerous lawsuits pending in federal and state courts across the country arising out of or relating to Defendants' fraudulent scheme commenced by certain of the End-Investors (collectively, the "Investor Actions"). A list of the Investor Actions currently known to the Receiver is attached hereto as **Exhibit D**.

While certain of the Investor Litigation actions are pending against Defendants themselves, the Receiver has discovered that there are also several cases pending against the Principal Aggregators and/or their insiders who aggregated investments in the Defendants from individual End-Investors (and occasionally from still other aggregator entities) who did not have direct contractual agreements with 1inMM. Only some of the End-Investors have commenced litigation, and those cases are pending in different jurisdictions and do not appear to be coordinated in any way.

The Receiver, through her counsel, has been monitoring developments in the Investor Actions to assess their impact, if any, on the administration of the Receivership Estate. This is particularly because any recoveries that the End-Investor plaintiffs obtain on their own as a result of the Investor Actions would likely affect any distributions the Receiver would make to such End-Investors (to the extent that they hold allowed claims) during a claims process in this case.

The End-Investors are generally pursuing claims that belong uniquely to them, as opposed to claims that are property of the Receivership Estate. Those claims, include, for example: common law fraud; violations of state securities laws; negligent misrepresentation; conspiracy to defraud; breach of contract; and breach of fiduciary duty. Some of the End-Investors are, however, pursuing claims that belong to the Receivership Estate (or are derivative of such claims), particularly where they pursue parties alleged to be "net winners" of Defendants' Ponzi scheme or where they seek any money paid by 1inMM to any person or entity ("Estate Claims").[5]

The Receiver has, through her counsel, had conversations with counsel for the parties on both sides of Investor Litigation about the Receiver's duties generally and the anti-litigation stay in the Order of Appointment in particular.[6] These discussions

---

[5] This is intended to be an illustrative, not an exhaustive, definition of what constitutes Estate Claims.

[6] The Order of Appointment contains an anti-litigation injunction that broadly "restrain[s] and enjoins[s]" all persons or entities—including "investors"—from directly or indirectly: (a) "commencing, prosecuting, continuing or enforcing any suit or proceeding (other than the present action by the SEC or any other action by the government)" against Defendants, their subsidiaries and affiliates; (b) "using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any property or property interests owned by or in the possession of Defendant 1inMM"; and (c) "doing any act or thing whatsoever to interfere with taking control, possession or management by the

have all been cooperative and constructive, and to date no party to those cases has taken a position that is adversarial to the Receiver. On the contrary, all parties have indicated a desire to comply with the terms of the Order of Appointment.

The Receiver is working with counsel for the plaintiffs in the Investor Litigation to ensure that they do not pursue any Estate Claims, as those are subject to the stay in the Order of Appointment. The Receiver is also considering establishing a more formal level of cooperation with certain parties to the Investor Actions to clarify the interrelationship between those actions and the Receivership Estate and to maximize recoveries for the End-Investors, among other reasons.

It has become apparent that there is some degree of confusion among the parties to the Investor Actions regarding the scope of the anti-litigation stay in the Order of Appointment. The principal issue is whether the stay applies only to cases in which Defendants and/or their subsidiaries or affiliates are party-defendants, or more broadly to cases in which End-Investors seek the return of their money or related relief from their direct counterparty (i.e., one of the Principal Aggregators) based on factual allegations that their investments ultimately wound up in the hands of Defendants, who were running a Ponzi scheme. Put another way, there seems to be some good-faith confusion as to whether the anti-litigation injunction enjoins *indirect* claims against Defendants by End-Investors.

At least one federal district court[7] has recently ruled that it does, concluding that an investor's claim against a former employee of an intermediate aggregator alleged to be a "net winner" was stayed because the claim involved assets that are

---

permanent receiver appointed hereunder of the property and assets owned, controlled or managed by or in the possession of Defendant 1inMM, or in any way to interfere with or harass the permanent receiver or her attorneys, accountants, employees, or agents or to interfere in any manner with the discharge of the permanent receiver's duties and responsibilities hereunder." (Receiver Order Art. V.)

[7] *Gould v. Crookston*, No. 1:21 CV 06049 (N.D. Ill.) (Alonso, J.).

attributable to funds derived from investors or clients of Horwitz and 1inMM. (Transcript of Proceedings, Feb. 3, 2022, at 3:22-4:24, copy attached as **Exhibit E**.) The Receiver and her counsel are monitoring these developments and conferring with counsel in the Investor Actions regarding them.

As a result of her lawyers' discussions with counsel for the plaintiffs in the Investor Actions, it appears that these End-Investors feel as though they have no choice but to litigate to recover their investments, and many End-Investors perceive themselves to be in competition with other End-Investors in a race to obtain a judgment. While the Receiver recognizes that those End-Investors have the right to their day in court, the Receiver is considering ways to rationalize the proceedings so that efforts are not duplicated and this receivership realizes one of the objectives for the receivership as articulated by the SEC in its motion to appoint a receiver:

> A receiver is also justified to assist with pursuing an efficient collection and distribution of assets to the hundreds of victims of Horwitz's scheme, some of whom are proceeding independently in investor suits to recover available assets. Since the Commission filed its emergency action, certain of Horwitz's investors have already filed lawsuits against 1inMM and other investors in an effort to recover funds for themselves.

[ECF #65-1 pp. 7-8]

## V. NOTICE

Local Rule 66-7(c) requires a receiver to "give notice by mail to all parties to the action and to all known creditors of the defendant of the time and place for [the] hearing" on a receiver's report. LR 66-7(c). As discussed above, however, the Receiver is still attempting to ascertain the identities and contact information for the End-Investors, who the Receiver perceives to be main creditors of the Receivership Estate. Moreover, even if the Receiver had contact information for all of the End-Investors—of which the Receiver understands there are in excess of 200—it would be expensive to serve them with paper copies of a notice of hearing.

Accordingly, the Receiver has given notice by CM/ECF of the hearing on this Report only to the parties who have appeared in this action (except for Rogue Black, which is now under the Receiver's control). The Receiver will post a copy of this Report to the Website so it will be available to the general public, including the End-Investors. The Receiver anticipates being able to serve the End-Investors with copies of future quarterly reports and other important filings as she obtains information about their identities and contact information.

The Receiver submits that, under the present circumstances, no further or other notice is required, and requests that the Court dispense with any additional notice requirements under Local Rule 66-7(c).

## VI. CONCLUSION

Contemporaneously herewith, the Receiver is filing a motion to (a) approve this Report, including all disbursements made or to be made listed herein; (b) limit the notice of the hearing on the Report to that given, and dispensing with any additional notice requirements under Local Rule 66-7(c); and (c) grant such further relief as the Court deems necessary and appropriate.

Dated: May 2, 2022          Respectfully submitted,

By:    /s/*Michele Vives*
       Michele Vives, Receiver